Cite as 2024 Ark. App. 143

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR 23-147

| | | |
|---|---|---|
| TRAVIS ROBERTS | | **Opinion Delivered** February 28, 2024 |
| | **APPELLANT** | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CR-19-2714] |
| V. | | |
| | | HONORABLE BRAD KARREN, JUDGE |
| STATE OF ARKANSAS | | |
| | **APPELLEE** | AFFIRMED |

## STEPHANIE POTTER BARRETT, Judge

Travis Roberts was charged by criminal information in Benton County with one count of rape, one count of second-degree sexual assault, and two counts of distributing, possessing, or viewing matter depicting sexually explicit conduct involving a child.[1] A Benton County Circuit Court jury convicted Roberts of second-degree sexual assault, for which he was sentenced to seven years' imprisonment and thirteen years' suspended imposition of sentence, but it could not arrive at a unanimous verdict on the charge of rape.[2] On appeal, Roberts argues that the circuit court erred in denying his motion for directed

---

[1]The State nolle prossed the charge of distributing, possessing, or viewing matter depicting sexually explicit conduct involving a child charge prior to trial.

[2]The State also nolle prossed the rape charge after the jury was unable to reach a verdict.

verdict on the charge of second-degree sexual assault because there was insufficient evidence to support the conviction. We affirm.

The victim, MC, who was seventeen at the time of trial, stated that she and her mother moved in with Roberts when she was about three, and they lived with Roberts until she was fourteen. She testified that Roberts abused her from ages three to about eleven, when her mother became pregnant with her younger brother. MC revealed that Roberts sexually abused her after they moved out.

MC testified that Roberts would touch her and make her perform sexual acts on him. Specifically, she testified that before her younger brother was born, Roberts would often take her into the laundry room, where the lights would be off, and he would put his penis in her mouth and tell her to pretend it was a sucker, but she knew it was not a sucker because she could feel the hair on it in her mouth. MC further testified that toward the end of the period of abuse, Roberts would pull her pants down, put her on the arm of the couch, and "dry-hump" her against the couch; she stated that she would wait until he stopped and then take a shower. She said that Roberts would touch her body with his penis; he would "finger" her, meaning that he penetrated her with his fingers; and "there was the time where he even performed oral on me," which she explained was oral sex. MC also recounted an incident in which she and Roberts were upstairs in Roberts and her mother's bedroom lying on the bed; Roberts was on top of her with his clothes on; she was holding her legs together; and Roberts was "grinding" on her.

2

At the close of the State's case, Roberts's counsel moved for a directed verdict on both counts, arguing that there were three events the State would argue went toward the rape charge as to penetration. The first incident was MC's testimony that Roberts would finger her; however, he argued that there was no testimony as to where Roberts's hands supposedly were when he fingered her. Roberts's counsel stated that he was going to proceed under the assumption that the State was not going to say that fingering went toward the rape charge. The second incident was MC's testimony that Roberts performed oral sex on her; counsel argued that oral sex was never defined, and MC never testified where Roberts performed oral sex on her, i.e., where he touched her or with what part of his body he touched her. The third incident identified by Roberts's counsel was the allegation that Roberts put his penis in MC's mouth; however, he argued that it was dark when this happened, and MC never saw his penis or explained how she knew it was his penis.

As for second-degree sexual assault, Roberts's counsel argued that there were two incidents he assumed the State believed were sufficient to support that charge—the couch incident in which MC testified Roberts "dry-humped" her, and the bedroom incident in which she alleged Roberts lay on top of her in a bed and "grinded" against her. Counsel argued that the terms "dry hump," "grind," and "on top of her" were not defined for the jury, and there was never any evidence of where Roberts touched MC.

In response, the prosecutor conceded that when MC described Roberts performing oral sex on her, "that is not what the State is alleging is a rape in this case." However, the

3

prosecutor pointed to MC's testimony that Roberts "fingered" her and argued that while there was not a jury instruction defining "fingering," it was within the jury's purview "to understand what the vic—what the witness was referring to and what the definitions of commonly understood terms could be." The prosecutor noted MC's testimony that Roberts's finger penetrated her. However, for purposes of the rape charge, the prosecutor focused on the fact that MC testified that Roberts had put his penis in her mouth and that she had known it was his penis and had described that it had hair on it.

In response to Roberts's counsel's argument regarding the sufficiency of the evidence for second-degree sexual abuse, the prosecutor noted that MC specifically stated Roberts's fingers penetrated her and that he also performed oral sex on her. The prosecutor said he did not know whether the State could prove penetration on the basis of MC's testimony that Roberts performed oral sex on her, but he argued sexual contact could be proved on the basis of that testimony. The prosecutor then addressed the "dry-humping" incident on the couch, arguing that the definition of "dry-humping" was clear and coupled with MC's testimony that Roberts pulled her pants down and "dry-humped" her, "those two facts taken together indicate that there was sexual contact by the touching, directly or through the clothing, of her sex organs or buttocks or breasts." The prosecutor also addressed the bedroom incident, stating that was a second instance of "dry-humping," and he believed the jury had sufficient evidence to determine that sexual contact occurred in that instance as well.

Roberts's counsel responded that he understood the State was not alleging that the oral sex was penetration for purposes of the rape allegation, but he argued that the "fingering" incident also could not support rape because there was no evidence of what body part was penetrated. Counsel argued that regarding the couch incident, the State failed to prove where on MC Roberts was allegedly "dry-humping," and as for the bed incident, there was no testimony as to where on MC Roberts was supposedly "grinding." The directed-verdict motions were denied; they were renewed at the close of all of the evidence, at which time they were again denied.

In closing arguments, the prosecutor set forth the elements of rape and then argued,

> Let's talk about the evidence and how the State has met its burden of proof as to Count Number One, rape. The jury instruction also says it is no defense to the charge of rape that the alleged victim consented to the conduct because at her age [MC] was incapable of consenting.

> Here's what you can take to the bank. Here's what happened in trial. [MC] told you unequivocally that in the laundry room downstairs, isolated from the rest of the house, the defendant -- that the defendant told her he had a sucker for her, and she described in vivid detail that he placed his penis in her mouth. She described that she could feel his hair, she could feel his pubic hair, I would argue, in her mouth, on her mouth. And, ladies and gentlemen, that is such a vivid, scarring memory. It's clear from watching her yesterday that that is seared in her brain forever.

> She told you that she was less than ten years old when it happened, so she was certainly less than fourteen years old. And moreover, she said it happened before her six-year-old brother was born. So, we've proven that she was less than fourteen.

> That's rape, ladies and gentlemen. If you believe her testimony there and you believe that we've proven that charge beyond a reasonable doubt, that's the ballgame as to that charge. Then you can consider the rest of her testimony when she said that he fingered her, penetrated her, and that she didn't know years ago when she first told people about this that she didn't understand that that also constituted rape, you

5

can consider all of that when you're making your decision. But his placing his penis in her mouth is absolutely, unequivocally rape. And all you need is to believe her testimony as to that count and you must return a verdict of guilty on the count of rape.

The prosecutor then set forth the elements of sexual assault in the second degree and argued,

I also want to point out, ladies and gentlemen, -- and you will get to read this instruction when you go back there. Read it for yourselves. You don't have to take my word for it. That could be the defendant touching, directly or indirectly or through the clothing, of [MC's] sex organs or buttocks or anus or her breasts, or it could be the defendant using [MC's] body to touch his own sex organs. That's an important distinction or that is an important thing that you can consider both of those things in considering whether the State has proved that sexual contact occurred between the defendant and [MC].

So let's talk about the evidence that came in, and there was a plethora of testimony of countless times where sexual contact occurred. You just have to pick one. [MC] described a time when her mom was asleep that the defendant pulled down her pants, pushed her over the couch, and dry-humped her. Ladies and gentlemen, that's him pushing his private parts against hers. I don't think there's any dispute about what that means or what [MC] was talking about.

She also said that the defendant performed oral sex on her. I don't think there's any dispute that that's sexual contact.

[MC] also talked about another time before her brother was born when someone named Dewey Cope had been visiting the house before she was born, so she would've been under the age of fourteen. She said that the defendant was in bed, in his bed with her, he was on top of her grinding her and that she had hoped that Dewey Cope would come up the stairs and catch them in the act. Ladies and gentlemen, that is sexual contact. That is through the clothing the touching of his sexual organs onto [MC]. She told you that all of this happened -- she said all of the abuse happened when "I was between the ages of three and ten." So she was under the age of fourteen.

6

We have proven sexual contact with her, that [MC] was not married to Travis Roberts, and that she was under the age of fourteen. Pick any of those awful things that [MC] described and that's sexual assault in the second degree.

A motion for directed verdict at a jury trial is considered a challenge to the sufficiency of the evidence. *Marbley v. State*, 2019 Ark. App. 583, 590 S.W.3d 793. When reviewing a challenge to the sufficiency of the evidence, this court must assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Bahena v. State*, 2023 Ark. App. 261, 667 S.W.3d 553. We affirm a conviction if there is substantial evidence, either direct or circumstantial, to support the verdict. *Marbley*, *supra*. Substantial evidence is evidence of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation and conjecture. *Bahena*, *supra*. Witness credibility is an issue for the fact-finder, which may believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.* A jury is not required to believe all or any part of a defendant's or witness's statement and is entitled to draw upon common sense and experience in reaching its verdict. *Price v. State*, 2019 Ark. 323, 588 S.W.3d 1.

Second-degree sexual assault is committed when a person who is eighteen years of age or older engages in sexual contact with another person who is less than fourteen years old and not the person's spouse. Ark. Code Ann. § 5-14-125(a)(3) (Supp. 2017). Sexual contact is defined as any act of sexual gratification involving the touching, directly or through clothing, of the sex organs, buttocks, or anus of a person or the breast of a female. Ark.

Code Ann. § 5-14-101(10) (Repl. 2013). Sexual gratification is not defined by the statutory code, but the two words have been interpreted according to their plain meaning. *Gilton v. State*, 2018 Ark. App. 486, 562 S.W.3d 257. A sexual-assault victim's testimony may constitute substantial evidence to sustain a conviction for sexual assault. *Bahena*, *supra*. The victim's testimony need not be corroborated, and the victim's testimony alone describing the sexual contact is enough for a conviction. *Id.*

Roberts, citing *Dunn v. United States*, 442 U.S. 100 (1979), argues that, given the specific delineation of incidents between rape and second-degree sexual assault that the State made in its directed-verdict response and in its closing arguments, it locked in its "theory of the case" at that time and cannot change its arguments on appeal. In *Dunn*, Dunn was convicted of making false statements to a grand jury in June 1976 regarding one of Dunn's fellow inmates, Phillip Musgrave, which resulted in Musgrave's being indicted for conspiracy to manufacture and distribute methamphetamine. The indictment charged that Dunn's grand-jury testimony was inconsistent with statements he made in September 1976 while under oath at Musgrave's attorney's office. At trial, the Government introduced, over Dunn's objection, parts of his grand-jury testimony; the sworn statement he gave at Musgrave's attorney's office in September 1976; and testimony he gave at an October 1976 evidentiary hearing. Dunn was convicted, and the Tenth Circuit Court of Appeals affirmed, noting that the October hearing in which Dunn adopted his September statement was a proceeding ancillary to a grand-jury investigation, and even though the indictment specified

the September interview and not the October hearing, the Tenth Circuit held that the discrepancy was a nonprejudicial variance between the indictment and the proof presented at trial. The United State Supreme Court granted certiorari and reversed the decision of the Tenth Circuit, holding, "A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." 442 U.S. at 105 (citing *Berger v. United States*, 295 U.S. 78 (1935)). The United Stated Supreme Court held that it was erroneous to instruct the jury to rest its decision on Dunn's September statement but for the court of appeals to affirm the conviction on Dunn's October testimony. The *Dunn* court held, "To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused." 442 U.S. at 106. Roberts also cites *Connecticut v. Robert H.*, 866 A.2d 1255 (Conn. 2005), in which the Connecticut Supreme Court recognized that while evidence is construed in a light most favorable to sustaining the verdict, deference is given to credibility determinations made by the finder of fact, and there is an assumption that "the fact finder is free to consider all of the evidence adduced at trial in evaluating the defendant's culpability, and presumably does so, regardless of whether the evidence is relied on by the attorneys," 866 A.2d at 1270, and those principles cannot be applied in a vacuum and must be "considered in conjunction with an equally important doctrine, namely that the state cannot change the theory of the case on appeal." *Id.* at 1271. The Connecticut Supreme

Court affirmed the reversal of three convictions by the Appellate Court of Connecticut because the State brought the charges under the "act" prong of the criminal statute at issue and not the "situation" prong, but the evidence supported only the "situation" prong, not the "act" prong of the criminal statute.

Roberts contends that, pursuant to *Dunn*, the State can only argue on appeal the sufficiency of the three incidents specifically delineated in the directed-verdict motions and closing arguments at trial with regard to the second-degree sexual assault—the oral sex comment, the couch incident, and the bed incident—to support his conviction for second-degree sexual assault on appeal, and none of those three incidents are sufficient to support his conviction.

Roberts's *Dunn* argument is unpersuasive. Roberts was charged with rape and second-degree sexual assault as described above. In *Dunlap v. State*, 303 Ark. 222, 795 S.W.2d 920 (1990), our supreme court explained:

> We have held that it is only necessary that an indictment name the offense and the party to be charged. Defendants may be charged by either indictments or informations. The state is not required to include a statement of the act or acts constituting the offense, unless the offense cannot be charged without doing so. The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet.

303 Ark. at 228, 795 S.W.2d at 923–24 (citations omitted).

Here, Roberts was apprised of the offenses with which he was charged, and the jury was not instructed that it was limited to applying certain conduct to rape and other conduct

10

only to second-degree sexual assault. Witness credibility is an issue for the finder of fact, who is free to believe all or a portion of any witness's testimony and whose duty it is to resolve questions of conflicting testimony and inconsistent evidence; the jury may accept or reject testimony as it sees fits. *Langlois v. State*, 2023 Ark. App. 263, 666 S.W.3d 884. MC described Roberts's placing his penis in her mouth, which is sexual contact, and it is sufficient to support Roberts's second-degree sexual-assault conviction.

Even if we were persuaded that Roberts's *Dunn* argument was applicable, we would still affirm because there is sufficient evidence to support Roberts's second-degree sexual-assault conviction in the evidence Roberts concedes can be considered on appeal for that offense. Roberts argues that "dry humping" and "grinding" were left undefined for the jury and were given no context or definition, and MC never clarified which parts of Roberts's body touched what parts of her body, leaving the jury to resort to pure speculation and conjecture on those two issues. We disagree. A jury is entitled to draw upon common sense and experience in reaching its verdict. *Price, supra*. In *Gilton, supra*, this court affirmed a conviction for second-degree sexual assault on the testimony of the victim that the appellant had "humped" her, which was taken to mean that he had inappropriately touched her. In the present case, MC testified that Roberts pulled her pants down, put her over the couch, and "dry-humped" her. A jury could determine that this action constituted sexual contact. Likewise, MC testified that on one occasion, Roberts was lying on top of her in his and her mother's bed with his clothes on, she was holding her legs together, and he was "grinding"

on her.  This is sufficient evidence from which the jury could conclude that Roberts had sexual contact with MC.

Affirmed.

GLADWIN and GRUBER, JJ., agree.

*Wilkinson Law Firm*, by: *Bryan Altman* and *Shane Wilkinson*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., for appellee.